IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

FILED
2017 SEP 22 PM 12:42
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

James Camper

**Plaintiff,**

**VS**

Lyft Tennessee, Inc. and Lyft, Inc.

**Registered Agent:**

CT Corporation System

800 S. Gay St.

Suite 2021

Knoxville, TN 37929

**Defendant,**

Logan Green

John Zimmer

Cara Crossan

**All three of these defendants can be served at:**

Lyft Nashville Office

150 2nd Ave. N.

Nashville, TN 37201

# COMPLAINT

This case includes allegations of sexual harassment, wrongful termination, retaliation, religious discrimination, negligent hiring, and emotional distress. Most of these torts are federally-protected rights and that is what gives this Honorable Court jurisdiction to hear these claims.

Furthermore, all of the claims are alleged to have occurred in Davidson County, TN; which makes this location the proper venue for these claims to be heard.

# STATEMENT OF CLAIM

James Camper (hereinafter referred to as Plaintiff Camper signed an arbitration agreement with former employer, Lyft, Inc. (hereinafter referred to as Respondent Lyft) upon being hired. The arbitration is attached for further review by the court; however, in brief, the agreement allows an employee to bring forth any claims or allegations against the company through negotiations, mediation, and finally, arbitration. The arbitration agreement is relatively long and detailed; however, the main components are:

- Lyft and I agree that any dispute shall be addressed in the following manner: first, through good-faith negotiation between Lyft and me; second, through a voluntary mediation paid for by Lyft, if both parties agree to mediation, administered by a mediator approved by Lyft and me; and third, if still not resolved, by final, binding and confidential arbitration. The arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its Employment Arbitration Rules & Mediation Procedures then in effect. I understand that copies of these rules are available to me at https://www.adr.org and that Lyft will provide me with copies upon my request. I acknowledge that I had a full and fair opportunity to read and review these rules to the extent that I wished before accepting this Arbitration Agreement.
- The AAA's rules will govern the amount and allocation of fees for the arbitration, subject to the provisions of this section. Lyft will pay any costs that are unique to the arbitration process, including fees for the arbitrator's time and use of an arbitration forum
- To facilitate good-faith negotiations, I agree to send written notice to arbitrationnotice@lyft.com stating the nature of my claim in sufficient detail to advise Lyft of the nature of the dispute and the relief I request.
- Lyft and I agree that the arbitration will take place in (1) San Francisco, California, (2) if I elect, in the county in which I was employed with the company at the time that the dispute arose, or (3) at another location agreed to by the parties or if the parties cannot agree, at a location designated by the arbitrator as a location convenient to both parties.
- Lyft and I agree that any dispute shall be addressed in the following manner: first, through good-faith negotiation between Lyft and me; second, through a voluntary mediation paid for by Lyft, if both parties agree to mediation, administered by a mediator approved by Lyft and me; and third, if still not resolved, by final, binding and confidential arbitration. The arbitration shall be administered by the American

Arbitration Association ("AAA") pursuant to its Employment Arbitration Rules & Mediation Procedures then in effect.
- Lyft and I agree to bring any Claims in arbitration on an individual basis only, and not on a class or collective basis. Accordingly, neither I nor Lyft shall bring, nor shall the arbitrator preside over, any form of class or collective proceeding. In addition, unless all parties agree in writing otherwise, the arbitrator shall not consolidate or join the arbitrations of more than one employee.
- The types of disputes and claims covered by this Arbitration Agreement (referred to below as "Claims") include, but are not limited to disputes over rights provided by federal, state, or local statutes, regulations, ordinances, and common law; claims related to salary, overtime, bonuses, vacation, paid time off, wages, meal and rest breaks, and any other form of compensation; claims for breach of contract, wrongful discharge, fraud, defamation, emotional distress, retaliation and breach of the implied covenant of good faith and fair dealing; and claims involving laws that prohibit discrimination and unlawful harassment based on any protected classification, including claims under Title VII of the Civil Rights Act of 1964

In Plaintiff Camper's initial arbitration notice, I was a current employee of Respondent Lyft and sought $500,000.00 for sexual harassment, negligent hiring, emotional distress and religious discrimination.

At the time that the original arbitration notice was sent, I had never been approached or otherwise informed about any wrongdoing in the company. However, after sending my arbitration notice to company leadership, I was suddenly terminated from Lyft the very next day and given baffling reasons as to why I was being terminated. Therefore, I have added wrongful termination/ retaliation to my list of grievances, have raised my relief amount and seeking injunctive relief.

Plaintiff Camper asserts that since sending the arbitration notice to Respondent Lyft, Respondent Lyft has not been in contact with Plaintiff Camper regarding the notice or even to let me know that it's been received. It is Plaintiff Camper's conviction that Respondent Lyft intends to intentionally delay a process that they agreed to initiate, pay for, and resolve "promptly."

## **RELIEF AND DAMAGES**

Although I am willing to go through arbitration for my claims, I am requesting this Honorable Court to force Respondent Lyft to honor the arbitration agreement and to give dates and deadlines for resolving the claim. It is my belief that Respondent Lyft is a very unethical company with immoral values and is attempting to ignore my complaint or intends to have me wait an extensive period of time before responding.

I request that the Court enforce the attached executed agreement and prevent Respondent Lyft from being able to unreasonably delay the arbitration process or from expeditiously paying for the

3

Case 3:17-cv-01298 Document 1 Filed 09/22/17 Page 3 of 18 PageID #: 3

Exhibit A.

# MUTUAL ARBITRATION AGREEMENT

1. **Disputes Subject To Arbitration**

Lyft and I hereby agree that any and all claims, disputes or controversies between Lyft and me that arise out of or are related in any way to my employment relationship with Lyft (except those excluded below) shall be resolved by final and binding arbitration. For purposes of this Mutual Arbitration Agreement (the "Arbitration Agreement"), references to Lyft shall include Lyft, Inc., and/or any entity affiliated with or related to Lyft, Inc. (including their owners, officers, directors, managers, employees, agents, fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them). This Arbitration Agreement is governed by the Federal Arbitration Act and survives after the Agreement terminates or my relationship with Lyft ends. **Any arbitration under the Arbitration Agreement will take place on an individual basis; class arbitrations and class actions are not permitted. Lyft and I further expressly waive the right to a jury trial, and Lyft and I agree that the arbitrator's award will be final and binding on both parties.**

This Arbitration Agreement is intended to be broadly interpreted. The types of disputes and claims covered by this Arbitration Agreement (referred to below as "Claims") include, but are not limited to disputes over rights provided by federal, state, or local statutes, regulations, ordinances, and common law; claims related to salary, overtime, bonuses, vacation, paid time off, wages, meal and rest breaks, and any other form of compensation; claims for breach of contract, wrongful discharge, fraud, defamation, emotional distress, retaliation and breach of the implied covenant of good faith and fair dealing; and claims involving laws that prohibit discrimination and unlawful harassment based on any protected classification, including claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, and any state employment statutes, such as the California Fair Employment & Housing Act, and the California Labor Code.

2. **Disputes Excluded From Arbitration**

This Arbitration Agreement does not cover claims for disability and medical benefits under workers' compensation laws or claims for unemployment benefits. Likewise, nothing in this Arbitration Agreement prohibits me from filing an administrative charge with the federal Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, the Office of Federal Contract Compliance Programs, the California Department of Fair Employment & Housing, or any other similar local, state, or federal agency, or from participating in any administrative agency investigation. Notwithstanding this Arbitration Provision, either Lyft or I may seek to obtain injunctive relief in court to avoid irreparable harm that might take place prior to the resolution of any arbitration.

3. **Class Action/Collective Action Waiver**

**Lyft and I agree to bring any Claims in arbitration on an individual basis only, and not on a class or collective basis. Accordingly, neither I nor Lyft shall bring, nor shall the arbitrator preside over, any form of class or collective proceeding. In addition, unless all parties agree in writing otherwise, the arbitrator shall not consolidate or join the arbitrations of more than one employee.** Neither I nor Lyft may seek, nor may the arbitrator award, any relief that is not individualized to the claimant or that affects other employees.

Notwithstanding any other provision of this Arbitration Agreement, the scope, applicability, enforceability, revocability or validity of this section may be resolved only by a court of competent jurisdiction and not by an arbitrator. If a court decides that applicable law does not permit the enforcement of any of this section's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court.

4. **Representative PAGA Waiver**

To the fullest extent permitted by law, Lyft and I (1) **agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698** *et seq.*, in

any court or in arbitration, and (2) agree that for any claim brought on a private attorney general basis, including under the California PAGA, **any such dispute shall be resolved in arbitration on an individual basis only** (*i.e.*, to resolve whether I have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (*i.e.*, to resolve whether other individuals have been aggrieved or subject to any violations of law) (collectively, "representative PAGA Waiver"). Notwithstanding any other provision of this Arbitration Agreement, the scope, applicability, enforceability, revocability or validity of this representative PAGA Waiver may be resolved only by a court of competent jurisdiction and not by an arbitrator.

If any provision of this representative PAGA Waiver is found to be unenforceable or unlawful for any reason: (i) the unenforceable provision shall be severed from this Arbitration Provision; (ii) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Agreement or the requirement that any remaining Claims be arbitrated on an individual basis pursuant to the Arbitration Provision; and (iii) any such representative PAGA claims or other representative private attorneys general act claims must be litigated in a court of competent jurisdiction and not in arbitration. To the extent that there are any Claims to be litigated in a court of competent jurisdiction because a court determines that the representative PAGA Waiver is unenforceable with respect to those Claims, the Parties agree that litigation of those Claims shall be stayed pending the outcome of any individual Claims in arbitration.

5. **The Arbitration Process**

Lyft and I agree that any dispute shall be addressed in the following manner: <u>first</u>, through good-faith negotiation between Lyft and me; <u>second</u>, through a voluntary mediation paid for by Lyft, if both parties agree to mediation, administered by a mediator approved by Lyft and me; and <u>third</u>, if still not resolved, by final, binding and confidential arbitration. The arbitration shall be administered by the American Arbitration Association ("AAA") pursuant to its Employment Arbitration Rules & Mediation Procedures then in effect. I understand that copies of these rules are available to me at https://www.adr.org and that Lyft will provide me with copies upon my request. I acknowledge that I had a full and fair opportunity to read and review these rules to the extent that I wished before accepting this Arbitration Agreement.

Lyft and I agree that the procedures outlined in this Arbitration Agreement will be the exclusive means of resolution for any Claims covered by this Arbitration Agreement, whether such disputes are initiated by Lyft or by me.

Lyft and I agree that the arbitration will take place in (1) San Francisco, California, (2) if I elect, in the county in which I was employed with the company at the time that the dispute arose, or (3) at another location agreed to by the parties or if the parties cannot agree, at a location designated by the arbitrator as a location convenient to both parties.

As part of the arbitration, both Lyft and I will have the opportunity for reasonable discovery of non-privileged information that is relevant to the Claim. The arbitrator, in his or her sole discretion, may permit any discovery necessary to allow either party to have a fair opportunity to pursue that party's claims and defenses.

6. **Paying For The Arbitration**

The AAA's rules will govern the amount and allocation of fees for the arbitration, subject to the provisions of this section. Lyft will pay any costs that are unique to the arbitration process, including fees for the arbitrator's time and use of an arbitration forum. I will pay any costs that I am required to pay under the AAA rules that would be imposed on me in a judicial forum, but in no event shall the AAA filing fee that I am responsible for paying exceed the filing fees that I would have paid if I had filed a complaint in a court of law having jurisdiction. I understand that I will be responsible for retaining my own attorney.

7. **The Arbitration Award**

The arbitrator shall have authority to award monetary damages and any and all other individualized remedies that would be available in court, and the arbitrator's decision of whether or not to award such damages and

remedies shall be based on the statute or common law upon which the arbitrated claim(s) is/are based. The arbitrator shall have authority to award to the prevailing party reasonable costs and attorneys' fees incurred in either bringing or defending an action under this Agreement, to the extent such costs or fees would be recoverable under the law or statute giving rise to the claim(s) arbitrated.

The arbitrator will issue a written decision that memorializes the essential findings of fact and law and the conclusions upon which the arbitrator's decision and the award, if any, are based.

### 8. The Arbitration Initiation Procedure

To facilitate good-faith negotiations, I agree to send written notice to arbitrationnotice@lyft.com stating the nature of my claim in sufficient detail to advise Lyft of the nature of the dispute and the relief I request. I agree that I will provide Lyft with that notice at least 45 days before initiating any arbitration under this Arbitration Provision. Lyft agrees to do the same if it initiates any claim against me. I understand that the notice will be used to investigate the claim, so that Lyft and I can engage in good-faith negotiations to resolve it promptly.

### 9. The Arbitration Agreement Opt-Out Procedure

I acknowledge that I have the opportunity to opt out of this Arbitration Agreement. To do so, I must provide notice in writing to Lyft's Legal Department (by email to arbitrationnotice@lyft.com or by postal mail to Legal Department, Attn: Employment Counsel; Lyft, Inc.; 185 Berry Street; Suite 5000, San Francisco, CA 94107) specifically stating that I do not wish to be bound by this Arbitration Agreement. I understand that such notice must be e-mailed or postmarked within thirty days (30 days) of my receipt of this Agreement in order to opt out. I understand that I will not be penalized in any manner for opting out of the Agreement.

### 10. Enforcement Of The Arbitration Agreement

This Arbitration Agreement is the full and complete agreement relating to the resolution of disputes between Lyft and me. In the event any portion of this Agreement is deemed unenforceable, the remainder of this Arbitration Agreement will be enforceable except as otherwise provided above.

*******************************************************************************************

**My signature below indicates that I understand and agree to be legally bound by this Mutual Arbitration Agreement, including its waiver of jury trials and class, representative, and private attorney general actions.**

| James Camper | *James Camper* | Jul 3, 2017 |
|---|---|---|
| *Employee Name* | *Signature* | *Date* |
| Logan Green, CEO | [signature] | Jul 3, 2017 |
| *Lyft Representative Name* | *Signature* | *Date* |

# ARBITRATION NOTICE

<u>Claimant: James Camper</u>

<u>Respondent: Lyft, Inc.</u>

<u>Date: Tuesday, September 19, 2017; updated and revised on Friday, September 22, 2017</u>

On or about Monday, July 17, 2017, James Camper (hereinafter referred to as Claimant Camper) began working for Lyft, Inc. (hereinafter referred to as Respondent Lyft). Claimant Camper was hired in the capacity of a Critical Response Associate.

On Friday, August 4, 2017, after a mandatory training session for all new employees had concluded, Claimant Camper reached out to leaders at Respondent Lyft; Jennifer Brandenburger (Director, Critical Response and Shared Services; hereinafter referred to as Mrs. Brandenburger) and Mary Winfield (VP, Customer Experience and Trust; hereinafter referred to as VP Winfield) to discuss a racially-unfair training environment and to address other concerns about my training experience.

Mrs. Winfield never got back in touch with me regarding my email and blatantly showed disregard for any concern that I, as an employee, wanted to bring to her attention. Mrs. Brandenburger did get back in touch with me regarding my email, however, she stated during our conversation that my allegations would be investigated and after that conversation, I was never contacted again regarding the investigation or my complaints.

On Monday, August 14, 2017; Claimant Camper began officially working on the company's overnight team, reporting to team lead, Corey Harris.

Corey Harris and another team lead, Terrica Davis (hereinafter referred to as Mrs. Davis), rotate in their various shifts as overnight leaders and I do not work with Mr. Harris at all times. During the times that I worked with Mrs. Davis, I attempted many times to bring my fresh ideas about the Lyft platform and how to make our company more of a force to her attention. Mrs. Davis was always argumentative during these conversations and instead of taking my ideas and reaching out to the appropriate channels to see if my ideas could be incorporated, she easily became someone who was impossible to bring complaints and/ or ideas to. Our training instructors stated many times to bring any ideas or suggestions about our jobs/ the platform to team leads and our ideas would always be weighed accordingly. This was stated many times during training. I constantly see things that are not good, improper, racist or simply unfair about the platform and attempt to be a team player and submit fresh ideas. In my role, I am constantly on the phone with drivers and passengers and I would know better than even a team lead what the platform-users constant complaints are and what they feel is unfair to them. In Mrs. Davis'

team lead role, I have never seen her on the phone with any customer or driver, unless that caller specifically asks to be routed to a supervisor.

Immediately after beginning overnight schedule, Claimant Camper noticed one employee in particular; Miranda Hunt (hereinafter referred to as Ms. Hunt), was extremely rude, exhibited aggressive-personality traits and overall displayed a superior attitude towards other associates. Ms. Hunt was not a leader or supervisor whatsoever; however, she took it upon herself to display such an egotistical position on our team.

Claimant Camper further claims that Ms. Hunt sexually harassed me; asked me on dates, inquired about what occupies me when I'm not at work, and was caught on numerous occasions staring at me.

Claimant Camper noticed that Mrs. Davis and Ms. Hunt had an unusual close relationship/friendship. Claimant Camper saw the two ladies converse for long periods nearly every night they worked together (about things unrelated to work).

Due to this close friendship, Claimant Camper felt scared and uneasy to go to leadership about Ms. Hunt's behavior of sexual harassment or about her behavior as a bully toward other associates.

On Monday, August 28, 2017, Claimant Camper sent an email to leaders at Respondent Lyft's Nashville office, Ms. Cara Crossan (People Business Partner; hereinafter referred to as Ms. Crossan) and Mrs. Brandenburger, complaining again about the racism that was prevalent during the training period, constant offensive usage of profanity during the training course, and to complain about a new incident involving one of the trainers, Ms. Catherine Walker. Claimant Camper's grievances about training were about Ms. Walker from the very beginning; however, Claimant Camper felt that she was still harassing me, even with being out of her training class and with a previous complaint pending.

On August 30, 2017, Ms. Crossan emailed Claimant Camper back to set-up a meeting to discuss my concerns about Ms. Walker. On Monday, September 4, 2017, Claimant Camper and Ms. Crossan had a video conference relating to my complaint. Ms. Crossan promised an investigation would be conducted. During this meeting, Claimant Camper also took the time to complain about the small amount of minorities working in leadership roles at the company and how the company seems to throw African-Americans into being Critical Response Associates; without regard to their experience, education, or talent to be in higher-ranking departments.

On Monday, September 11, 2017, an anonymous employee of Respondent Lyft sent an email to thirty-two people at the company; including executives, leadership, training managers and low-level Nashville office employees. The anonymous email had no identity of a person and was created with the email username of anonymouslyftemployee@gmail.com with a name of Anonymous Employee. The email included shocking and appalling information detailing that

Ms. Hunt was allegedly involved in her son's murder two years prior. The email was extensively detailed and long; however, the main points of the email are:

1.) "On January 21, 2015, Lyft Nashville employee, Miranda Hunt; along with her boyfriend, Wayne Jones, brutally and mercilessly beat Miranda's 1-year-old son, Hayden."
2.) "Miranda attempted to tell investigators and police that little Hayden had an allergic reaction to eating shrimp, but it was later discovered that was a complete fabrication of the facts."
3.) "During the autopsy, the medical examiner ruled little Hayden's death a homicide by blunt force trauma and determined that the child had been constantly beaten and abused for up to five months prior to his death."
4.) "On February 16, 2016, Miranda was arrested on charges of Felony Murder, Aggravated Child Endangerment, Aggravated Child Neglect and Aggravated Assault."
5.) "Miranda's story and crime was very big news in Nashville and has appeared on all of the local television news outlets and newspapers."
6.) "The Lyft Family website shows that her start date with Lyft wasn't until April 26, 2016."
7.) "You have no remorse or sympathy for what you have done. I learned during the course of my research that Child & Family Services had been at your home before to inquire about abuse allegations for your OTHER children. This makes you a serial child-abuser."
8.) "Lyft needs to do the right thing! Fire Miranda."

Later on the night of September 11th, VP Winfield sent an email to certain employees of the Nashville office stating that she was currently in Nashville, TN and that Ms. Hunt had been terminated based on the facts presented to the company.

On Wednesday, September 13, 2017, I attended a roundtable meeting with overnight associates, team leads, HR representatives and team leads to have an open discussion about Ms. Hunt's termination and for associates to ask additional questions.

During this roundtable, I asked Mrs. Winfield how a company who does background checks could allow a person formally accused of murder to get through the background process. Mrs. Winfield's idiotic philosophy and response to me was that "Lyft is a company of second chances" and that the company "does background checks, but doesn't have to." During the roundtable, Ms. Hunt's friends from overnight shift explained that she was a good person and that she helped them during her time there; etc. One associate in particular stated that the termination must be really hard on Ms. Hunt because she has two other children to support and that the email that was sent probably mentally brings back the entire incident for Ms. Hunt.

While I disagreed with the outrageous sympathy shown toward Ms. Hunt, for the purpose of peace, I held my disagreeable comments and simply allowed the circus to go forth. However, I did state in the meeting that I think the company made the right decision.

After the meeting was over, I felt it was a good time to express that I had been sexually harassed by Ms. Hunt. I noticed VP Winfield and Ms. Crossan sitting in a room privately and utilized the

8

company's Slack resource to let Ms. Crossan know that I wanted to speak with her and VP Winfield before they left for the evening (sent at 9:30 PM). Ms. Crossan never wrote me back. I also emailed VP Winfield directly and asked to speak with her and Ms. Crossan before they left (sent at 9:31 PM). VP Winfield finally emailed me back over an hour later (10:39 PM) and by this time, I had already went home for the evening. I was under the impression that VP Winfield was specifically there to speak to us, the employees, about the incident. Therefore, the fact that I wasn't getting timely responses was absurd and defeats the very reason why they were there that night. VP Winfield's own email to the team alleges that she was in town to "provide additional support and conversation;" however, that was obviously a lie.

During the meeting, VP Winfield went on and on about how there is an investigation into finding out who Anonymous is and that the company was determined to find out who she/ he is. VP Winfield didn't seem to care about correcting or even addressing the fact that the company had hired a murderer; only in finding out who Anonymous is. It was such a circus.

In the days following the informative email being distributed and the meetings with VP Winfield and Ms. Crossan, I experienced/ am experiencing physical sickness from the information about Ms. Hunt's horrible crime. As someone who is extremely passionate about children and their success/ safety, the fact that I was in close proximity to a murderer of a child made me dizzy, gave me headaches, and constantly made me meditate on the child and what he suffered during his brief time here on Earth. I was so emotionally distraught from this situation that I have taken several counseling sessions with Respondent Lyft's *Employee Assistance Program* and still will require extensive counseling about the incident in the future.

On or about Wednesday, September 20, 2017, Claimant Camper emailed a copy of this arbitration notice to Lyft leadership and to seemingly appropriate individuals. At the time that the email was sent, Claimant Camper was still an employee of Respondent Lyft.

On Thursday, September 21, 2017, Claimant Camper received an email from Jacky Cohen (Head of People Business Partners; hereinafter referred to as Ms. Cohen) to contact her before reporting to work that afternoon. After trading a few emails about what time I would call due to currently being at another job, Claimant Camper finally contacted Ms. Cohen a little after 5pm. Ms. Cohen stated that the company had completed a few investigations and that for the company's safety, the company was parting ways with me for the safety of its employees. When Claimant Camper inquired about what Ms. Cohen was referring to, Ms. Cohen further stated that a couple employees felt harassed by me.

This is the first time Claimant Camper has ever heard that anyone has felt harassed by me. This is the first time that Claimant Camper has ever been informed about any misconduct whatsoever during my tenure at Respondent Lyft. Respondent Lyft has never had any meetings with me or any conversations with me regarding any type of harassment concerns or any type of investigation that was taking place regarding allegations surrounding misconduct on my end.

9

It is clear to anyone that Respondent Lyft literally made-up these accusations in retaliation for my arbitration notice.

After learning of my termination, Claimant Camper told Ms. Cohen to have a good day and the conversation ended.

## *Count 1: Religious Discrimination (Violation of Religious Beliefs)*

According to the Equal Employment Opportunity Commission:

"The law requires an employer to reasonably accommodate an employee's religious beliefs or practices, unless doing so would cause more than a minimal burden on the operations of the employer's business. This means an employer may be required to make reasonable adjustments to the work environment that will allow an employee to practice his or her religion."

As stated above, Ms. Walker used much profanity during my time in her training class. Ms. Walked cursed nearly every other sentence in front of the rest of the class and me. The profanity was uncalled for and it was quite offensive. As a Christian, this is not language that I engage in nor is it language that I wish to hear in a public setting. I am prepared to argue that Ms. Walker's incessant affinity for the usage of profanity is a violation and disregard for my religious beliefs.

I specifically stated in my aforementioned emails to Ms. Crossan that Ms. Walker's profanity was offensive and should be investigated. However, in Ms. Crossan's response to me closing out the investigation, she never mentioned that she investigated the usage of profanity. There is no one who can deny that Ms. Walker was an avid curser during training; which leads me to believe that Ms. Crossan investigated some concerns, but did not investigate all concerns in my complaint.

Respondent Lyft did not provide any type of supervisor to periodically check in on the conduct of trainers and they also did not provide any type of feedback that could be left about training. Therefore, I would argue that Lyft has a culture of allowing some employees to be able to do what they want to do without any type of disciplinary action or adequate supervision.

Claimant Camper has gone on to see that profanity is prevalently used by many Lyft employees; however, the law specifically states that a company is "required to make reasonable adjustments to the work environment" in order to make religious employees feel included and to have a desire to be employed at the agency. I submit that Respondent Lyft has not and has not tried to make the reasonable adjustments that are required by law. I was subject to curse word after curse word out of the foul and nasty mouth of Ms. Walker. This wasn't a very pleasant or welcoming experience for someone who is brand new to the company. It was nothing short of disgusting.

10

Respondent Lyft had/ has a duty to protect employees from offensive behavior and to ensure that each employee's beliefs weren't being infringed upon. Lyft neglected that duty. Due to Respondent Lyft's refusal to set a work tone and environment that is inclusive of all people, including religious people, I am entitled to damages.

### *Count 2: Sexual Harassment*

According to the Equal Employment Opportunity Commission:

"Sexual harassment is a form of sex discrimination that violates Title VII of the Civil Rights Act of 1964.

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment.

Prevention is the best tool to eliminate sexual harassment in the workplace. Employers are encouraged to take steps necessary to prevent sexual harassment from occurring. They should clearly communicate to employees that sexual harassment will not be tolerated. They can do so by providing sexual harassment training to their employees and by establishing an effective complaint or grievance process.

The harasser can be the victim's supervisor, an agent of the employer, a supervisor in another area, a co-worker, or a non-employee. The harasser's conduct must be unwelcome."

As stated, over the course of weeks in working with Ms. Hunt, she sexually harassed me in many different ways; including by staring at me for long periods of time, asking me out on dates, inquiring about what I did in my free time; etc. As previously stated, I did not feel comfortable going to Respondent Lyft's leadership about the conduct because of several pending complaints that I had yet to receive any type of response for. Furthermore, one of the team leads for overnight shift, Mrs. Davis, seemed to be good friends with Ms. Hunt and I worried about the further stress and chaos it would cause to release this information and make it public.

Ms. Hunt's inappropriate behavior created an extremely "intimidating, hostile, or offensive work environment;" which is the layer prescribed by law as being able to be constituted as sexual harassment. Furthermore, I would argue that Respondent Lyft never discussed sexual harassment in our training nor had any type of orientation for this subject matter. Our training was specifically related to how to do our jobs and fulfill our positions, but didn't speak about personnel matters, how do deal with them, or who would be appropriate to talk to about them if they occurred.

It is clear that Ms. Hunt acted inappropriately due to her having a close relationship with a supervisor and seemingly probably felt protected from any misbehavior that she may have engaged in.

Respondent Lyft had/ has a duty to protect employees from sexual harassment or any offensive behavior and Lyft neglected that duty. Due to Respondent Lyft's refusal to protect me from this behavior, creating an environment where I didn't feel comfortable in reporting the harassment, and due to the behavior occurring while Ms. Hunt and I were working for Respondent Lyft, I am prepared to argue that Respondent Lyft is liable for Ms. Hunt's conduct and I am entitled to damages.

### *COUNT 3: Negligent Hiring*

As pointed out by the writer in the email to Lyft Staff, Ms. Hunt was arrested and charged with first-degree-murder, aggravated assault, aggravated child neglect, and aggravated child endangerment on February 16, 2016. She wasn't hired to be a Critical Response Associate for Lyft until April 26, 2016.

Beyond Ms. Hunt's criminal charges and arrest for four felonies, the writer of the email gives ample news articles of this story being publicly mentioned on various news outlets. Therefore, it is clear that Respondent Lyft knew or certainly should have known about Ms. Hunt's egregiously violent past. Respondent Lyft is a company that does extensive background checks through Sterling Talent Solutions and I find it very doubtful that these charges simply did not come up whatsoever during Ms. Hunt's background check.

It is my belief that Respondent Lyft knew about these charges and was properly informed by Sterling Talent Solutions of the charges; however, the company still decided to negligently hire and retain Ms. Hunt for a year and a half. I am prepared to argue that Respondent Lyft had a duty to inform employees that we were working with someone formally accused of such violent crimes and to give us some sort of information of a person's background that has been arrested for four felonies; including, but not limited to first-degree-murder.

Respondent Lyft only terminated Ms. Hunt when the anonymous writer threatened to go to the media if she wasn't terminated.

The fact that Ms. Hunt sexually harassed me and engaged in other behavior during my period of working with her that exhibited a similar conduct pattern of someone who was arrested for violence and aggression is important to why the company should be held liable for the tort of negligent hiring.

Respondent Lyft had/ has a duty to protect employees from any type of violent behavior or potential violent behavior by any employee. I am prepared to argue that Respondent Lyft

neglected that duty by having me work in such close proximity to someone formally accused of murder. The company's conduct is offensive and I feel the company directly put my safety in jeopardy by having a person who has committed such crimes in the office as an employee.

Due to the horrific information being circulated around the company, Respondent Lyft was forced to provide multiple team meetings about the incident, provide counseling sessions, and many people were visibly emotional for various reasons about the incident. None of these things would have happened or had to happen if Respondent Lyft would have made an informed and wise decision in choosing to simply not hire Ms. Hunt when first made aware of the charges.

Why do background checks and pay another company thousands of dollars if you're going to simply allow anyone, with any type of past, to work at the company?

Due to Respondent Lyft's negligence and due to the company outright ignoring the four felony charges of Ms. Hunt and not properly informing staff of who we were working with, I am prepared to argue that Respondent Lyft has engaged in negligent hiring and I am therefore entitled to damages.

### *COUNT 4: Emotional Distress*

Being sexually harassed by Ms. Hunt created a very emotionally-charged work environment. I was in no way attracted to Ms. Hunt and did not wish to build anything with her other than a working relationship. Her constant staring and asking me personal questions was evident that she was interested in something more than a working relationship. The fact that while this sexual harassment was going on, I didn't feel I had anyone to complain to; because A.) I had several ongoing pending complaints with no resolution and B.) Ms. Hunt had a close relationship with our overnight team lead caused me an insurmountable amount of emotional distress.

Moreover, as someone who has previously worked for the Department of Family & Children Services and someone who majored in Social Work, I am extremely passionate about children and their well-being. Therefore, the revelation of Ms. Hunt's past murder has caused me to attend multiple counseling sessions to receive help about the information.

I cannot seem to stop reflecting on the child's life or the trauma he experienced that night. The fact that the writer of the anonymous email conveys that the medical examiner concluded that the child was abused beginning at 6-months-old is highly disturbing and emotional for me to digest.

Respondent Lyft is the reason why I am experiencing emotional distress. I do not blame Ms. Hunt for the reason why I am experiencing emotional trauma. Ms. Hunt is a criminal and criminals will break laws; which is in their job description; however, I unequivocally blame Respondent Lyft as the cause of my emotional trauma. If Respondent Lyft would have simply

13

never hired Ms. Hunt or allowed normal and decent people to be introduced to her in the workplace, then we wouldn't have had to endure the detailed facts of her crime.

Due to Respondent Lyft's negligence, due to the company outright ignoring the four felony charges of Ms. Hunt, and allowing this criminal's crime to be exposed in this public way, I am prepared to argue that Respondent Lyft is liable for *my emotional distress and I am therefore entitled to damages.*

## COUNT 5: Wrongful Termination/ Retaliation

Again, Claimant Camper has never been approached, emailed or spoken to whatsoever about any allegations of wrongdoing or any allegations of harassment on my part. This was brand new and shocking information that was being brought to my attention during my termination phone call with Ms. Cohen.

Ms. Cohen stated that the company had conducted investigations; however, how can you conduct an investigation without questioning me about the allegations? How can you receive a complaint on an individual and not hear their side of the story; and then render a decision, and call that a complete investigation? What type of investigation is that?

It is Claimant Camper's belief and conviction that Respondent Lyft made-up harassment allegations or extremely exaggerated such allegations in an attempt to retaliate against me for my arbitration notice being sent to the company the day before.

Federal law forbids an employer from retaliating against an employee for bringing forth sexual harassment or discrimination allegations. Therefore, I am prepared to argue that Respondent Lyft has broken federal law by retaliating against me and I am entitled to damages.

## RELIEF AND DAMAGES

For the reasons stated above and throughout this arbitration notice, Claimant Camper is seeking relief in the following amounts:

**COUNT 1:** Religious Discrimination (Violation of Religious Beliefs); Seeking $500,000.00 (Five-Hundred Thousand Dollars)

**COUNT 2:** Sexual Harassment; Seeking $5,000,000.00 (Five Million Dollars)

**COUNT 3:** Negligent Hiring; Seeking $500,000.00 (Five-Hundred Thousand Dollars)

**COUNT 4:** Emotional Distress; Seeking $4,000,000.00 (Four-Million Dollars)

**COUNT 5:** Wrongful Termination/ Retaliation; Seeking $6,000,000.00 (Six-Million Dollars)

*The above is a total of $16,000,000.00 (Sixteen-Million Dollars).* It should be taken into consideration that I will need further counseling from this ordeal to completely heal. This ordeal has caused me to think negatively about the company, which I did not think negatively before this incident.

I feel the company directly put my safety in jeopardy and I feel that VP Winfield lied to the team about the company's knowledge of Ms. Hunt's charges. In the email to the team after Ms. Hunt was terminated, VP Winfield states "We will be reviewing what happened and improve processes to learn what we need to do differently going forward. Our number one priority is ensuring the safety of our employees." However, in a verbal conversation with the team, VP Winfield states that "Lyft is a company of second-chances" and went on to speak about how "there isn't a conviction." Therefore, I'm led to believe that the company doesn't see what it did wrong in this hiring and if Lyft is a company of second chances, will you also hire OJ Simpson when he's released from prison? I seriously doubt that if I, as a black man, applied for Lyft with a murder charge that the company would hire me and give the staff this whole "company of second chance" talk. It's stupid. It's potentially discriminatory.

There is a difference between being a company of second chances and hiring a murderer.

## Injunctive Relief

- Claimant Camper requests the respective mediator to reinstate me back to my position with the company.
- Claimant Camper requests the company to have an equilibrium portion of minorities represented in leadership positions in the company.

## Humanitarian/ Host/ Commentator

James Camper

www.jamescamper.com

camperjames@yahoo.com

404-790-2664

commencement of the arbitration with American Arbitration Association; which is what they agreed to do in the employment contract.

If Respondent Lyft refuses to pay for the arbitration and commence negotiation procedures, I will amend this complaint and add breach-of-contract in the near future.

*I further request this Honorable Court to allow this case to proceed in this court if Respondent Lyft has still not made reasonable efforts to uphold their part of the arbitration agreement by the time this case reaches its first civil court hearing.*

I hereby certify under penalty of perjury that the above Petition is true to the best of my information, knowledge, and belief.

James Camper,

Plaintiff

www.jamescamper.com

camperjames@yahoo.com

404-790-2664

Mailing Address:
837 Briley Pkwy
Nashville, TN 37217

4

# ATTACHMENTS

**EXHIBIT A:**

Arbitration Agreement executed by Respondent Lyft and Plaintiff Camper upon being hired

**EXHIBIT B:**

Current, updated, and revised arbitration notice re-sent to Respondent Lyft on Thurs, September 22.